ROGERS, Justice.
 

 In suit No. 8595 of the Twenty-First Judicial District Court, Parish of Tangipahoa, entitled Mrs. O. G. Drake et al. v. Bert Tucker, Inc., plaintiffs obtained a judgment for rent due and to become due under a lease covering a commercial building located in the Town of Ponchatoula. The judgment maintained the provisional seizure under which the stock of merchandise in the building was seized. A few days prior to the day on which the stock of merchandise was advertised for sale in accordance with the judgment, the Interstate Electric Company, a Louisiana corporation domiciled in the City of New Orleans, brought this suit against Bert E. Tucker, proprietor, Bert Tucker, Inc., Mrs. Ophelia G. Drake, Ernest G. Drake and Paul Drake, Jr., on an alleged indebtedness of $4,800. As an adjunct to its suit, plaintiff obtained a writ of attachment under which the sheriff' of the Parish of Tangipahoa was ordered to hold the proceeds of the sale of the stock of merchandise until the further orders of the court.
 

 Mrs. Paul Drake, Sr., died on June 30, 1939, and on September 19, 1939, Ernest G. Drake and Paul Drake, Jr., her co-defendants, were substituted as defendants for Mrs. Drake and all proceedings in the case were ordered continued as against Ernest G. Drake and Paul Drake, Jr., according to law.
 

 On December 22, 1939, judgment was rendered on the merits in the court below in favor of the Interstate Electric Company and against Bert E. Tucker for $4,781, with interest, maintaining plaintiff’s writ of attachment and its vendor’s lien and privilege upon the contents of the leased premises and on the proceeds of the sale thereof amounting to $1,080. Plaintiff’s demand for a personal judgment against Paul Drake, Jr., and Ernest G. Drake was rejected. This judgment was signed on May 15, 1940.
 

 The Interstate Electric Company appealed from the judgment so fax as it dismissed its claim against Paul Drake, Jr., and Ernest G. Drake, and the Drakes appealed from the judgment so far as it recognized plaintiff’s vendor’s lien and privilege as superior to their lessor’s lien and privilege.
 

 Plaintiff contends that the defendants, Bert Tucker, Ernest G. Drake and Paul Drake, Jr., as members of a commercial partnership, are liable in solido for the amount sued for, and that the Drakes are further liable to the extent of $2,000, under a continuing guaranty, executed in
 
 *665
 
 writing by their deceased father, Paul Drake, Sr. That the creation of a corporation, designated as “Bert Tucker, Inc.,” and the lease executed by the corporation in favor of the widow and heirs of Paul Drake, Sr., are nullities because they were executed with the fraudulent design of creating a preference in favor of the lessors on the stock of goods which was subject to plaintiff’s vendor’s lien.
 

 Plaintiff is the exclusive selling agent for the Dixie Auto-Lec Stores, Inc. In the latter part of December, 1936, or the early part of January, 1937, Bert E. Tucker obtained from plaintiff a franchise to open a Dixie Auto-Lec Store in the Town of Ponchatoula. The original order for merchandise, amounting to $2,000 given by Tucker to plaintiff, was paid for by Tucker with money advanced him by Paul Drake, Sr. In addition, Drake also executed an act. of continuing guaranty up to the sum of $2,000 to secure future purchases by Tucker. Drake died suddenly on January 8, 1937. The next day Tucker opened for business in a building owned by Drake.
 

 On March 1, 1937, Tucker and the widow and heirs of Drake, acting upon the advice of a certified public accountant, formed a corporation under the style of “Bert Tucker, Incorporated.” The corporation entered into a written lease with the widow and heirs of Drake covering the premises in which the business was located. The lease was for a period of three years at a monthly rental of Seventy Dollars.
 

 Tucker continued to operate the business and to pay the rent. The business was not a success and in the latter part of the year 1937, being advised of the condition of Tucker’s accounts, and after receiving a report from its representative who inspected the stock of merchandise carried by Tucker, plaintiff placed Tucker on a C.O.D. basis. In May, 1938, the rent due the Drakes being in default, they proceeded under the lease and provisionally seized the merchandise in the leased premises. The merchandise was sold by the sheriff, who is now holding $1,080, the net proceeds of the sale, pending the final decision in this suit.
 

 The amount in the hands of the sheriff is claimed by plaintiff, Interstate Electric Company, under its vendor’s lien and by the defendants, Ernest G. Drake and Paul Drake, Jr., under their lessor’s lien.
 

 Plaintiff, in support of the allegations of the petition that the business operated in the Town of Ponchatoula by Bert E. Tucker in the name of Dixie Auto-Lec Store, #122, Bert Tucker, Owner, was the business of a commercial partnership composed of Tucker and Paul Drake, Sr., and, after the death of the latter, his widow and heirs, relies upon the alleged admission by Drake and by Tucker and by certain alleged statements made by Ernest G. Drake and Paul Drake, Jr., the heirs of Paul Drake, Sr., and Mrs. Ophelia G. Drake.
 

 O. G. H. Rasch, secretary and treasurer of the Interstate Electric Company, testified that, in December, 1936, or January, 1937, Tucker and Paul Drake, Sr., called at his office to discuss the obtaining of a franchise for a Dixie Auto-Lec Store in Ponchatoula. That Drake stated he was forming a partnership with Tucker to open the business, and that as Drake was prom
 
 *667
 
 inently identified with other business enterprises in Ponchatoula, he did not desire to be known in the transaction. That the business was to be opened in a building owned by Drake, for the rent of which he was to receive $70.00 a month. That Drake was to finance the business and Tucker was to 'furnish his services. That Tucker would receive his living expenses out of the business and the remainder of the profits would be received by Drake until his original investment was repaid, and thereafter the parties would share alike. That Tucker signed the contract, and that Rasch asked Drake “to sign a continuing guaranty for $2,000.00 on the account so I could tie-in the arrangements we had.”
 

 Leon Mattes, sales manager of the Interstate Electric Company, testified that he received a message to go to the office of Rasch where he found Drake and Tucker. His testimony was to the same effect as that given by Rasch with reference to the discussion which took place among the parties.
 

 A. D. Hazelwood, a salesman for the plaintiff company, was in the Tucker store on January 8, 1938, the day Paul Drake, Sr., died. On January 18, 1938, Leon Mattes, accompanied by Hazelwood, visited Ponchatoula. Upon arriving there they called at the office of Paul Drake, Jr., where they also met Ernest G. Drake. They extended their sympathy to the Drakes on the death of their father. Ernest G. Drake left the office. Mattes testified that he then asked Paul Drake, Jr., if “the business was going to continue as it was originally started by his father,” and that Drake answered that “Bert Tucker would handle the business in the same manner as it was his father’s wish.” When asked by the attorney for plaintiff the direct question, “Did he state to you at that time that the estate of Paul Drake would continue their association with Mr. Tucker as under the same terms and relations as. agreed between Mr. Tucker and Mr. Paul Drake ?” he answered, “I assume as much.”1 Hazelwood testified that he was present during the conversation and that Paul Drake, Jr., told him that “they expected to-continue the business as their father originally planned.” On cross-examination, the witness admitted that Drake did not tell-them what that plan was. The witness also-apparently “assumed” that Tucker and Paul Drake, Sr., were partners in the business, although, he admitted that Tucker on-a previous occasion told him that no partnership existed between him and Drake-He also admitted that he could not positively say that Paul Drake, Jr., had stated there was any such partnership.
 

 J. M. Bass, Jr., representing the R. F. C., testified that in June, 1938, while-passing through Hammond, Louisiana, he was asked by the attorney for plaintiff to-ride with him to Ponchatoula; that he did so, and that they stopped at a filling station that was being operated by Bert Tucker; that the attorney for plaintiff interrogated Tucker concerning the opening of-the business of the Dixie Auto-Lec store in Ponchatoula; and that according to his. recollection Tucker admitted that the business was to be operated by him and Paul Drake, Sr., as a partnership. The attorney,, in rebuttal, over the objection of defend
 
 *669
 
 ants’ counsel, testified to the same effect. Tucker stated that, at the time, he was busy waiting
 
 on
 
 his customers and did not recollect all the 'conversation that took place, but he refused to sign a statement which the attorney prepared purporting to set forth the substance of the conversation. Tucker further declared, “If it (the statement) was what I said I would have signed it.” Moreover, it is plain that any statement made by Tucker outside the presence of the Drakes was not binding on them.
 

 There is no suggestion on the part of plaintiff that Mrs. Ophelia G. Drake, the widow of Paul Drake, Sr., made any admissions whatsoever concerning the business transaction between Tucker and her deceased husband. Nor does it appear from the record that Ernest G. Drake made any admissions relative to that transaction.
 

 Paul Drake, Sr., is dead, and therefore the Court is without the benefit of his version concerning the transaction. So far as relates to the admission he is said to have made that he was to be a partner in the business to be operated by Tucker, it may be observed that the admission of a dead man is the weakest kind of evidence. Tucker, who was present at the conversation and who was subjected to a searching -cross-examination by counsel for plaintiff, denied that either he or Drake had made any such admission.
 

 Tucker in his testimony set forth the relationship which existed between Paul Drake, Sr., and himself. He testified that he was well acquainted with Paul Drake, Sr., who was a man of substance; that Drake owned a building in Ponchatoula for which he was anxious to obtain a tenant; that he, Tucker, was anxious to go into business; that another person wrote to the Interstate Electric Company and obtained information relative to opening a store in Ponchatoula; that this person could not finance the proposition and that Tucker then talked to Drake about the matter; that Drake had previously assisted him by advancing money with which he went into business; that Drake agreed to furnish him with sufficient funds to again go into some business; that he personally made the arrangements with the Interstate Electric Company, and that Drake accompanied him to New Orleans, “more or less as an adviser and successful business man, wanting to see me succeed.”
 

 Tucker testified that Drake lent him $2,500, and that he agreed to lend him an additional $500 to start the business, the object of Drake being to obtain a permanent tenant for his building. Tucker agreed to pay Drake $70 a month rent for the building. Drake was not to receive a share oT the profits of the business, but Tucker was to repay him for his advances by small payments from time to time out of the profits.
 

 In weighing the testimony of the witnesses produced by the parties, we are met at the outset by the proposition that the burden is upon the plaintiff to establish the existence of a partnership between Tucker and Paul Drake, Sr. The testimony of the witnesses on this point is conflicting, but we think that the testimony of Tucker is on the whole more consistent with reason than that of the witnesses for
 
 *671
 
 the plaintiff, all of whom are either officers or employees of plaintiff. Tucker’s testimony is supported by a number of collateral circumstances. As a result of the conference between Rasch, representing the plaintiff, and Tucker, at which Paul Drake, Sr., was present, the plaintiff granted one of its franchises to Tucker, and Tucker alone signed the contract. Drake issued his check for $2,000 to the order of Tucker, not to the order of plaintiff, and Tucker endorsed this check to plaintiff for the purpose of paying for the original order of merchandise, as required by plaintiff. Upon the demand of plaintiff’s representative for security up to $2,000 for additional purchases of merchandise by Tucker, Drake executed a continuing guaranty.
 

 : If it were the intention of Paul Drake, Sr., to become a partner of Tucker, there Was no necessity for his issuing a check to Tucker and for Tucker to endorse the check to plaintiff. It would have been a much simpler matter for Drake to issue the check direct to the plaintiff. The fact that Drake signed a continuing guaranty evidences his intention to limit his liability to $2,000 rather than his intention
 
 to
 
 assume an unlimited solidary liability as a partner in the business. Plaintiff’s principal witness testified that he required the execution, of the continuing guaranty in order to “tie-in” Drake as a partner of Tucker. If Drake were a partner, even a silent partner as alleged by plaintiff, the signing óf the continuing guaranty was a useless formality, sin'ce Drake, as a partner would be' liable in solido for all the debts of the partnership. There is no testimony beyond the statement of plaintiff’s main witness, which is. denied by Tucker, that Drake signed the continuing guaranty in order that he might be tied-in as a partner of Tucker. If such had been the intention of the parties, a demand that the check be issued to plaintiff instead of to Tucker may have had more probative value, and, simpler still, the franchise, or a statement in writing to that effect, signed by Drake, would have been more effective to prove the existence of a partnership. It is too plain for argument that if Drake had intended to become a partner of Tucker, with equal readiness, he would have signed the franchise or a separate written document instead of executing the continuing guaranty.
 

 The evidence affirmatively shows 'that from the beginning the advances made by Drake to Tucker were carried on Drake’s books as an indebtedness due by Tucker personally, and that the amount of the indebtedness was $2,551 at the time of Drake’s death.
 

 On January 8, 1937, the day before the store was to be opened for business, Drake died suddenly. Subsequently, Tucker opened and operated the store as his personal business. The sign on the store indicated that Tucker was the owner and all the business dealings and transactions had between plaintiff and Tucker were on that basis.
 

 The continuing guaranty signed by Paul Drake, Sr., terminated at his death. Plaintiff, through its representatives, acquired knowledge of the death when it oc
 
 *673
 
 curred, and plaintiff has failed to establish by a preponderance 'of evidence that the widow and heirs of the deceased extended the guaranty, or waived the expiration thereof. Buckeye Cotton Oil Co. v. Amrhein, 168 La. 139, 121 So. 602.
 

 It is significant that when the plaintiff became aware of Tucker’s inability to take care of his account, they placed him on a C. O. D. basis and called on him personally for inventories, but they never, at that time or at any other time, made any demand whatever on the widow and heirs of Drake, either under the continuing guaranty or under their alleged liability as partners.
 

 So far as concerns the plaintiff’s claim that the estate of Paul Drake, Sr., continued in the business as a partner of Tucker, it suffices to say that plaintiff failed to produce any evidence to substantiate its claim. The only basis for the claim is the statement attributed - to Paul Drake, Jr., that the business arrangement with Tucker would continue as it had been planned by his deceased father. It is obvious that Paul Drake’s idea of his father’s plan was wholly different from the plan suggested by the plaintiff’s witnesses. Neither of the Drakes at any time stated they were partners in the business or promised to pay its debts. On the contrary, the testimony shows that all that was expected by the Drakes was the payment of the rent and the repayment of the advances, with interest, by Tucker. This testimony is borne out by the written agreement between the widow and heirs of Drake with Tucker, hereinafter referred to.
 

 The trial judge held, in effect, that no partnership existed between Paul Drake, Sr., or his heirs, and Tucker, and that there was no liability resting upon the Drakes under the continuing guaranty signed by Paul Drake, Sr. Our conclusion is that the holding is correct.
 

 Plaintiff makes much of the formation of the corporation designated as Bert Tucker, Inc., and the execution of the lease by the corporation. We do not find' anything fraudulent in these transactions. There is nothing to show that the business was insolvent or in failing circumstances when the corporation was formed and the lease was executed. The business had been operating only one and a half months when these transactions took place, and it continued to operate an additional fourteen and a half months before it was closed. It appears from the record that the stock in the corporation was acquired by the widow and heirs of Drake in satisfaction of the indebtedness against Tucker for the advances that were made to him, aggregating at the time about $3,000.
 

 By written agreement entered into a few days subsequent to the signing of the charter of the corporation, the widow and heirs of Paul Drake, Sr., granted Bert Tucker an option to purchase the stock held by them, or any portion thereof, in multiples of one hundred (the par value of each share) at any time within three years from the date, with eight per cent per annum interest, to the date of the actual transfer.
 

 
 *675
 
 The object sought by the parties in these transactions which were entered into on the advice of Bourgeois, the certified public accountant, was to protect the Drakes for the money that had been advanced to Tucker. If the business had proved to he a success, it is clear that Tucker would have availed himself of his option to purchase the stock of the corporation held by the Drakes. In that event the Drakes, undoubtedly, would have been repaid the amount of their advances to Tucker, with interest. Beyond executing the lease referred to, it does not appear that the corporation was connected in any manner with the operation of the business by Tucker. Neither of the Drakes exercised, through the corporation or otherwise, any supervision or control over the business, which was carried on by Tucker in the same manner as it had been prior to the formation of the corporation. Plaintiff’s representatives visited the store frequently and were acquainted with the stock and the condition of Tucker’s account and, generally, the manner in which he carried on his business.
 

 We find no merit in plaintiff’s contention that the defendants by the formation of the corporation violated Act 114 of 1912, as amended by Act 270 of 1926, commonly known as the Bulk Sales Law.
 

 We have carefully searched the record and fail to find any evidence showing the transfer of the business and assets of Tucker to Bert Tucker, Inc. So far as we are able to see, the only effect of the formation of the corporation and the execution of the lease was to substitute the corporation for Tucker as the tenant of the Drake heirs. This, however, did not destroy the lessor’s lien on the stock of goods in the leased premises, because that lien attaches not only to the effects of the lessee, but also to the effects belonging to third persons when their goods are contained in the house or store by their own consent, express or implied. Civ.Code, Articles 2705, 2707, 2709, and 3219. Thus it has been held that merchandise consigned to a lessee for the purpose of sale was subject to the lessor's privilege. Goodrich v. Bodley, 35 La.Ann. 525; Henry Rose Mercantile & Mfg. Co. v. Stearns, 159 La. 957, 106 So. 455. This privilege is superior to that of the vendor. Civ.Code, Art. 3230.
 

 Since the Drakes’ lessor’s privilege is superior to the plaintiff’s vendor’s privilege, it is obvious that part of the judgment appealed from,, maintaining plaintiff’s writ of attachment and the superiority of its vendor’s privilege upon the contents of the seized premises and the proceeds thereof, is erroneous and must be annulled.
 

 For the reasons assigned the judgment appealed from, so far as it is rendered in favor of the Interstate Electric Company and against defendants, Bert E. Tucker, Ernest G. Drake, and Paul Drake, Jr., maintaining plaintiff’s writ of attachment and its vendor’s lien and privilege upon the contents of the Dixie Auto-Lec Store No. 122 of Ponchatoula, Louisiana, and the proceeds from the sale thereof now on hand in the Sheriff’s office, and ordering that the Interstate Electric Company be paid with preference over the defendants and all others, is annulled.
 

 
 *677
 
 It is now ordered that the judgment be amended in favor of Bert E. Tucker, Ernest G. Drake, and Paul Drake, Jr., dissolving the writ of attachment obtained by the Interstate Electric Company, and that the lessor’s lien and privilege of Ernest G. Drake and Paul Drake, Jr., upon the contents of the Dixie Auto-Lec Store, No. 122, Ponchatoula, Louisiana, and upon the proceeds derived from the sale thereof now on hand in the sheriff’s office in the Parish of Tangipahoa, be paid to Ernest ,G. Drake and Paul Drake, Jr., by preference over the claim of the Interstate Electric Company and all other creditors. As thus amended, the judgment appealed from is affirmed. The Interstate Electric Company is to pay the costs of these proceedings.
 

 O’NIELL, C. J., and LAND, J., absent.
 

 PONDER, J., recused.